1  McGREGOR W. SCOTT
   United States Attorney
2  ANDRÉ M. ESPINOSA
   KEVIN KHASIGIAN
3  Assistant United States Attorneys
   501 I Street, Suite 10-100
4  Sacramento, CA 95814
   Telephone: (916) 554-2700
5

6  Attorneys for Plaintiff
   United States of America
7

**FILED**

OCT 2 2 2019

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
              DEPUTY CLERK

8              IN THE UNITED STATES DISTRICT COURT

9                 EASTERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,            CASE NO. 2:19-CR-182-JAM

12                      Plaintiff,       PLEA AGREEMENT

13              v.                       DATE:  OCTOBER 22, 2019
                                         TIME:  9:15A.M.
14  RONALD J. ROACH,                     COURT: HON. JOHN A. MENDEZ

15                      Defendant.

16

17              I.      **INTRODUCTION**

18      A.      <u>Scope of Agreement.</u>

19          The Information in this case charges the defendant with violations of Title 18, United States

20  Code, Section 371—Conspiracy to Commit an Offense Against the United States ("Count One"), and

21  Title 15, United States Code, Sections 77q(a) and 77x—Securities Fraud ("Count Two"). This

22  document contains the complete plea agreement between the United States Attorney's Office for the

23  Eastern District of California (the "government") and the defendant regarding this case. This Plea

24  Agreement is limited to the United States Attorney's Office for the Eastern District of California and

25  cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities.

26      B.      <u>Court Not a Party.</u>

27          The Court is not a party to this Plea Agreement. Sentencing is a matter solely within the

28  discretion of the Court, and the Court may take into consideration any and all facts and circumstances

PLEA AGREEMENT                            1

1  concerning the criminal activities of the defendant, including activities which may not have been

2  charged in the Information.  The Court is under no obligation to accept any recommendations made by

3  the government, and the Court may in its discretion impose any sentence it deems appropriate up to and

4  including the statutory maximum stated in this Plea Agreement.

5       If the Court should impose any sentence up to the maximum established by the statute, the

6  defendant cannot, for that reason alone, withdraw his guilty plea, and he will remain bound to fulfill all

7  of the obligations under this Plea Agreement.  The defendant understands that neither the prosecutor,

8  defense counsel, nor the Court can make a binding prediction or promise regarding the sentence he will

9  receive.

10           **II.       DEFENDANT'S OBLIGATIONS**

11    **A.    Guilty Plea.**

12       The defendant will plead guilty to violating Title 18, United States Code, Section 371—

13  Conspiracy to Commit an Offense Against the United States ("Count One"), and Title 15, United States

14  Code, Sections 77q(a) and 77x—Securities Fraud ("Count Two").  The defendant agrees that he is in

15  fact guilty of this charge and that the facts set forth in the Factual Basis for Plea attached hereto as

16  Exhibit A are accurate.

17       The defendant agrees that this Plea Agreement will be filed with the Court and become a part of

18  the record of the case.  The defendant understands and agrees that he will not be allowed to withdraw his

19  plea should the Court not follow the government's sentencing recommendations.

20       The defendant agrees that the statements made by him in signing this Agreement, including the

21  factual admissions set forth in the factual basis, shall be admissible and useable against the defendant by

22  the United States in any subsequent criminal or civil proceedings, even if the defendant fails to enter a

23  guilty plea pursuant to this Agreement.  The defendant waives any rights under Fed. R. Crim. P. 11(f)

24  and Fed. R. Evid. 410, to the extent that these rules are inconsistent with this paragraph or with this

25  Agreement generally.

26       1.     Waiver of Indictment.

27       The defendant acknowledges that under the United States Constitution he is entitled to be

28  indicted by a grand jury on the charges to which he is pleading guilty and that pursuant to Fed. R. Crim.

PLEA AGREEMENT                    2

1    P. 7(b) he agrees to waive any and all rights he has to being prosecuted by way of Indictment to the

2    charges set forth in the Information.  The defendant agrees that at a time set by the Court, he will sign a

3    written waiver of prosecution by Indictment and consent to proceed by Information rather than by

4    Indictment.

5        **B.    Restitution.**

6        The Mandatory Victim Restitution Act requires the Court to order restitution to the victims of

7    certain offenses.  The defendant agrees that his conduct is governed by the Mandatory Restitution Act

8    pursuant to 18 U.S.C. § 3663A(c)(1)(A)(ii) and agrees to pay the full amount of restitution to all victims

9    affected by this offense, including, but not limited to, the victims covered in the factual basis, victims

10   covered in those counts to be dismissed as part of the Plea Agreement pursuant to 18 U.S.C. §

11   3663A(a)(3), and other victims as a result of the defendant's conduct for the offenses charged from the

12   periods through in or about September 2013 and in or about December 2018.  The amount of restitution

13   has not yet been determined but will likely be between approximately $800 million and $1 billion.

14       Restitution payments shall be by cashier's or certified check made payable to the Clerk of the

15   Court.

16       The defendant further agrees that he will not seek to discharge any restitution obligation or any

17   part of such obligation in any bankruptcy proceeding.

18       **C.    Fine.**

19       The defendant reserves the right to argue to Probation and at sentencing that he is unable to pay a

20   fine, and that no fine should be imposed.  The defendant understands that it is his burden to affirmatively

21   prove that he is unable to pay a fine, and agrees to provide a financial statement under penalty of perjury

22   to the Probation Officer and the government in advance of the issuance of the draft Presentence

23   Investigation Report, along with supporting documentation.  The government retains the right to oppose

24   the waiver of a fine.  If the Court imposes a fine, the defendant agrees to pay such fine if and as ordered

25   by the Court, up to the statutory maximum fine for the defendant's offense.

26       **D.    Special Assessment.**

27       The defendant agrees to pay a total special assessment of $200 (comprised of $100 per count of

28   conviction) at the time of sentencing by delivering a check or money order payable to the United States

PLEA AGREEMENT                        3

1  District Court to the United States Probation Office immediately before the sentencing hearing.  The

2  defendant understands that this Plea Agreement is voidable at the option of the government if he fails to

3  pay the assessment prior to that hearing.

4         **E.**    **Violation of Plea Agreement by Defendant/Withdrawal of Plea.**

5        If the defendant, cooperating or not, violates this Plea Agreement in any way, withdraws his

6  plea, or tries to withdraw his plea, this Plea Agreement is voidable at the option of the government.  If

7  the government elects to void the Agreement based on the defendant's violation, the government will no

8  longer be bound by its representations to the defendant concerning the limits on criminal prosecution

9  and sentencing as set forth herein.  A defendant violates this Plea Agreement by committing any crime

10  or providing or procuring any statement or testimony which is knowingly false, misleading, or

11  materially incomplete in any litigation or sentencing process in this case, or engages in any post-plea

12  conduct constituting obstruction of justice.  Varying from stipulated Guidelines application or

13  agreements regarding arguments as to 18, United States Code, section 3553, as set forth in this

14  Agreement, personally or through counsel, also constitutes a violation of the Plea Agreement.  The

15  government also shall have the right (1) to prosecute the defendant on any of the counts to which he

16  pleaded guilty; (2) to reinstate any counts that may be dismissed pursuant to this Plea Agreement; and

17  (3) to file any new charges that would otherwise be barred by this Plea Agreement.  The defendant shall

18  thereafter be subject to prosecution for any federal criminal violation of which the government has

19  knowledge.  The decision to pursue any or all of these options is solely in the discretion of the United

20  States Attorney's Office.

21        By signing this Plea Agreement, the defendant agrees to waive any objections, motions, and

22  defenses that the defendant might have to the government's decision.  Any prosecutions that are not

23  time-barred by the applicable statute of limitations as of the date of this Plea Agreement may be

24  commenced in accordance with this paragraph, notwithstanding the expiration of the statute of

25  limitations between the signing of this Plea Agreement and the commencement of any such

26  prosecutions.  The defendant agrees not to raise any objections based on the passage of time with respect

27  to such counts including, but not limited to, any statutes of limitation or any objections based on the

28  Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment to any counts that were not time-

1   barred as of the date of this Plea Agreement.  The determination of whether the defendant has violated
2   the Plea Agreement will be under a probable cause standard.

3       In addition, (1) all statements made by the defendant to the government or other designated law
4   enforcement agents, or any testimony given by the defendant before a grand jury or other tribunal,
5   whether before or after this Plea Agreement, shall be admissible in evidence in any criminal, civil, or
6   administrative proceedings hereafter brought against the defendant; and (2) the defendant shall assert no
7   claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal
8   Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by
9   the defendant before or after this Plea Agreement, or any leads derived therefrom, should be suppressed.
10  By signing this Plea Agreement, the defendant waives any and all rights in the foregoing respects .

11      **F.    Asset Disclosure.**

12      The defendant agrees to make a full and complete disclosure of his assets and financial
13  condition, and will complete the United States Attorney's Office's "Authorization to Release
14  Information" and "Financial Affidavit" within five (5) weeks from the entry of the defendant's change
15  of plea, including supporting documentation.  The defendant also agrees to have the Court enter an order
16  to that effect.  The defendant understands that if he fails to complete truthfully and provide the described
17  documentation to the United States Attorney's office within the allotted time, he will be considered in
18  violation of the Agreement, and the government shall be entitled to the remedies set forth in section II.E
19  above, above.

20      **G.    Agreement to Cooperate.**

21      The defendant agrees to cooperate fully with the government and any other federal, state, or local
22  law enforcement agency, as directed by the government.  As used in this Plea Agreement, "cooperation"
23  requires the defendant:  (1) to respond truthfully and completely to all questions, whether in interviews,
24  in correspondence, telephone conversations, before a grand jury, or at any trial or other court
25  proceeding; (2) to attend all meetings, grand jury sessions, trials, and other proceedings at which the
26  defendant's presence is requested by the government or compelled by subpoena or court order; (3) to
27  produce voluntarily any and all documents, records, or other tangible evidence requested by the
28  government; (4) not to participate in any criminal activity while cooperating with the government; and

1  (5) to disclose to the government the existence and status of all money, property, or assets, of any kind,

2  derived from or acquired as a result of, or used to facilitate the commission of, the defendant's illegal

3  activities or the illegal activities of any conspirators.

### III.    THE GOVERNMENT'S OBLIGATIONS

**A.    Dismissals/Other Charges.**

The government agrees not to bring any other charges arising from the conduct outlined in the Factual Basis attached hereto as Exhibit A.  The government also agrees not to reinstate any dismissed count except if this Agreement is voided as set forth herein, or as provided in paragraphs II.E (Violation of Plea Agreement by Defendant/Withdrawal of Pleas), III.B.3 (Reduction of Sentence for Cooperation), VI.B (Estimated Guideline Calculation), and VII.B (Waiver of Appeal and Collateral Attack) herein.

**B.    Recommendations.**

1.    Incarceration Range.

The government will recommend that the defendant be sentenced to the low end of the applicable guideline range as determined by the Court at sentencing.

2.    Acceptance of Responsibility.

The government will recommend a two-level reduction (if the offense level is less than 16) or a three-level reduction (if the offense level reaches 16) in the computation of his offense level if the defendant clearly demonstrates acceptance of responsibility for his conduct as defined in U.S.S.G. § 3E1.1.  This includes the defendant meeting with and assisting the probation officer in the preparation of the pre-sentence report, being truthful and candid with the probation officer, and not otherwise engaging in conduct that constitutes obstruction of justice within the meaning of U.S.S.G § 3C1.1, either in the preparation of the pre-sentence report or during the sentencing proceeding.

3.    Reduction of Sentence for Cooperation.

The government agrees to recommend at the time of sentencing that the defendant's sentence of imprisonment be reduced by up to 50% of the applicable guideline sentence if he provides substantial assistance to the government, pursuant to U.S.S.G. § 5K1.1.  The defendant understands that he must comply with paragraphs II.G and not violate this Plea Agreement as set forth in paragraph II.E herein. The defendant understands that it is within the sole and exclusive discretion of the government to

PLEA AGREEMENT                                    6

determine whether the defendant has provided substantial assistance.

The defendant understands that the government may recommend a reduction in his sentence of less than 50% or no reduction at all; depending upon the level of assistance the government determines that the defendant has provided.

The defendant further understands that a motion pursuant to U.S.S.G. § 5K1.1 is only a recommendation and is not binding on the Court, that this Plea Agreement confers no right upon the defendant to require that the government make a § 5K1.1 motion, and that this Plea Agreement confers no remedy upon the defendant in the event that the government declines to make a § 5K1.1 motion. In particular, the defendant agrees not to try to file a motion to withdraw his guilty plea based on the fact that the government decides not to recommend a sentence reduction or recommends a sentence reduction less than the defendant thinks is appropriate.

If the government determines that the defendant has provided further cooperation within one year following sentencing, the government may move for a further reduction of his sentence pursuant to Rule 35 of the Federal Rules of Criminal Procedure.

**C.   Use of Information for Sentencing.**

The government is free to provide full and accurate information to the Court and Probation, including answering any inquiries made by the Court and/or Probation and rebutting any inaccurate statements or arguments by the defendant, his attorney, Probation, or the Court. The defendant also understands and agrees that nothing in this Plea Agreement bars the government from defending on appeal or collateral review any sentence that the Court may impose.

## IV.   ELEMENTS OF THE OFFENSE

At a trial, the government would have to prove beyond a reasonable doubt the following elements of the offense to which the defendant is pleading guilty.

**1.   18 U.S.C. § 371—Conspiracy to Commit an Offense Against the United States (Count One).**

Although *not* elements of Conspiracy to Commit an Offense Against the United States, in violation of 18 U.S.C. § 371, the elements of the underlying criminal offense (Wire Fraud, in violation of 18 U.S.C. § 1343) are:

a.  The defendant knowingly participated in a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises;

b.  The statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

c.  The defendant acted with the intent to defraud; that is, the intent to deceive or cheat; and

d.  The defendant used, or caused to be used, a wire communication to carry out or attempt to carry out an essential part of the scheme.

Thus, to convict the defendant at trial on the charge of Conspiracy to Commit an Offense Against the United States, in violation of 18 U.S.C. § 371 (Count One), the government would have to prove beyond a reasonable doubt that:

a.  Beginning at least as early as in or about March 2011, and ending in or about December 2018, there was an agreement between two or more people to commit wire fraud as charged in the Information;

b.  Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

c.  One of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

**2.  15 U.S.C. §§ 77q(a) and 77x—Securities Fraud (Count Two).**

To convict the defendant at trial on the charge of Securities Fraud, in violation of 15 U.S.C. §§ 77q(a) and 77x ("Count Two"), the government would have to prove beyond a reasonable doubt that:

a.  The defendant offered or sold securities as described in the Information;

b.  In the offer or sale of these securities, the defendant made use of any means or instruments of transportation or communication in interstate commerce or made use of the United States mails; and

c.  In the offer or sale of these securities, the defendant willfully, knowingly, and deliberately did at least one of the following:

(i)  employed any device, scheme, or artifice to defraud;

(ii) obtained money by means of any untrue statements of material facts or omitted statements of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(iii) engaged in a transaction, practice, or course of business that operated or would operate as a fraud or deceit upon the purchasers.

The defendant fully understands the nature and elements of the crimes charged in the Information to which he is pleading guilty, together with the possible defenses thereto, and has discussed them with his attorney.

## V.     MAXIMUM SENTENCE

### A.     Maximum Penalties.

#### 1.     18 U.S.C. § 371—Conspiracy to Commit an Offense Against the United States (Count One).

The maximum sentence that the Court can impose on Count One is 5 years of incarceration, a fine of $250,000, a 3-year period of supervised release and a special assessment of $100. By signing this Plea Agreement, the defendant also agrees that the Court can order the payment of restitution for the full loss caused by the defendant's wrongful conduct. The defendant agrees that the restitution order is not restricted to the amounts alleged in the specific count to which he is pleading guilty. The defendant further agrees, as noted above, that he will not attempt to discharge in any present or future bankruptcy proceeding any restitution imposed by the Court.

#### 2.     15 U.S.C. §§ 77q(a) and 77x—Securities Fraud (Count Two).

The maximum sentence that the Court can impose on Count Two is 5 years of incarceration, a fine of $250,000, a 3-year period of supervised release and a special assessment of $100. By signing this Plea Agreement, the defendant also agrees that the Court can order the payment of restitution for the full loss caused by the defendant's wrongful conduct. The defendant agrees that the restitution order is not restricted to the amounts alleged in the specific count to which he is pleading guilty. The defendant further agrees, as noted above, that he will not attempt to discharge in any present or future bankruptcy proceeding any restitution imposed by the Court.

### B.     Violations of Supervised Release.

The defendant understands that if he violates a condition of supervised release at any time during the term of supervised release, the Court may revoke the term of supervised release imposed on each Count and require the defendant to serve up to 2 additional years imprisonment.

PLEA AGREEMENT                                        9

1

## VI.    SENTENCING DETERMINATION

2       **A.    Statutory Authority.**

3       The defendant understands that the Court must consult the Federal Sentencing Guidelines and

4 must take them into account when determining a final sentence.  The defendant understands that the

5 Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the

6 Sentencing Guidelines and must take them into account when determining a final sentence.  The

7 defendant further understands that the Court will consider whether there is a basis for departure from the

8 guideline sentencing range (either above or below the guideline sentencing range) because there exists

9 an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into

10 consideration by the Sentencing Commission in formulating the Guidelines.  The defendant further

11 understands that the Court, after consultation and consideration of the Sentencing Guidelines, must

12 impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

13      **B.    Stipulations Affecting Guideline Calculation.**

14      The government and the defendant agree that there is no material dispute as to the following

15 sentencing guidelines variables and therefore stipulate to the following:

16      **(i)  Count One: 18 U.S.C. § 371—Conspiracy to Commit an Offense Against the United**
          **States.**

17

18      **1.  Base Offense Level**: The base offense level for the charges to which the defendant is

19 pleading guilty is **6**.  See U.S.S.G. § 2B1.1(a)(2).

20      **2.  Specific Offense Characteristics:**

21          a.  Twenty-eight levels are added **(+30)** because the loss attributable to the defendant
              during the time period of his knowing involvement in the conspiracy and within the

22          scope of his knowing involvement exceeded $550,000,000.  Id. at (b)(1)(P).

23          b.  Two levels are added **(+2)** because the offense involved 10 or more victims.  Id. at
              (b)(2)(A).

24

25          c.  Two levels are added **(+2)** because the offense involved sophisticated means and
              the defendant intentionally engaged in or caused the conduct constituting

26          sophisticated means.  Id. at (b)(10)(C).

27      **3.  Preliminary Offense Level:** The parties anticipate that the preliminary offense level

28 will be **40**.

PLEA AGREEMENT                          10

4. **Chapter Three Adjustments**:

    a. Two levels are added **(+2)** because the defendant was an organizer, leader, manager, or supervisor in any criminal activity. U.S.S.G. § 3B1.1(c).

    b. Two levels are added **(+2)** because the defendant abused a position of private trust in a manner that significantly facilitated the commission or concealment of the offense. U.S.S.G. § 3B1.3.

5. **Adjusted Offense Level**: The parties anticipate the adjusted offense level will be **44**.

(ii) <u>**Count Two: 15 U.S.C. §§ 77q(a) and 77x—Securities Fraud.**</u>

1. **Base Offense Level**: The base offense level for the charges to which the defendant is pleading guilty is **6**. <u>See</u> U.S.S.G. § 2B1.1(a)(2).

2. **Specific Offense Characteristics:**

    a. Twenty-eight levels are added **(+30)** because the loss attributable to the defendant during the time period of his knowing involvement in the conspiracy and within the scope of his knowing involvement exceeded $550,000,000. <u>Id.</u> at (b)(1)(P).

    b. Two levels are added **(+2)** because the offense involved 10 or more victims. <u>Id.</u> at (b)(2)(A).

    c. Two levels are added **(+2)** because the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means. <u>Id.</u> at (b)(10)(C).

3. **Preliminary Offense Level**: The parties anticipate that the preliminary offense level will be **40**.

4. **Chapter Three Adjustments**:

    a. Two levels are added **(+2)** because the defendant was an organizer, leader, manager, or supervisor in any criminal activity. U.S.S.G. § 3B1.1(c).

    b. Two levels are added **(+2)** because the defendant abused a position of private trust in a manner that significantly facilitated the commission or concealment of the offense. U.S.S.G. § 3B1.3.

5. **Adjusted Offense Level**: The parties anticipate the adjusted offense level will be **44**.

6. **Grouping Multiple Counts:**

    a. The Counts in the Information to which the defendant is pleading guilty may be grouped together under U.S.S.G. § 3D1.2(d).

b. The offense level applicable to the grouped Counts is 44, which is the offense level corresponding to the aggregate quantity of loss, determined in accordance with Chapter Two and Parts A, B, and C of Chapter Three of the Sentencing Guidelines. See U.S.S.G. § 3D1.3(b).

c. Three levels are subtracted **(-3)** if the defendant pleads guilty, accepts responsibility for his offense, and the Specific Offense Level is above 16. U.S.S.G. § 3E1.1; see also Part III.B.2 above.

**7.   Adjusted Offense Level:** Given the stipulations above, the parties anticipate that the adjusted offense level will be **41**.

**8.   Criminal History:** The parties agree and stipulate that the applicable criminal history will be determined by the Court's probation officers.  The parties estimate but do not stipulate that the defendant's criminal history category will be I, and that the Guidelines sentencing range will be no less than **324 to 405** months in prison, subject, however, to the maximum possible sentence for his offense of conviction.  The defendant understands that if his criminal history category differs from the parties' estimate, his Guidelines sentencing range may differ from that set forth here.

**C.   <u>Departures or Other Enhancements or Reductions.</u>**

The parties agree that they will not seek or argue in support of any other specific offense characteristics, Chapter Three adjustments (other than the decrease for "Acceptance of Responsibility"), or cross-references, except that the government may move for a departure or an adjustment based on the defendant's cooperation (§5K1.1) or post-plea obstruction of justice (§3C1.1).  Both parties agree not to move for, or argue in support of, any departure from the Sentencing Guidelines, or any deviance or variance from the Sentencing Guidelines under United States v. Booker, 543 U.S. 220, 125 S.Ct. 738 (2005).

The defendant also agrees that the application of the United States Sentencing Guidelines to his case results in a reasonable sentence and that the defendant will not request that the Court apply the sentencing factors under 18 U.S.C. § 3553 to arrive at a different sentence than that called for under the Sentencing Guidelines' advisory guideline range as determined by the Court.  The defendant acknowledges that if the defendant requests or suggests in any manner a different sentence than what is called for under the advisory guideline range as determined by the Court, that will be considered a

1   violation of the Plea Agreement.  The government's remedies and remaining obligations in this

2   Agreement shall be as outlined in paragraph II.E, above.

3        Notwithstanding the above, at sentencing, the defendant may argue, under 18 U.S.C. § 3553(a)

4   and U.S.S.G. § 5G1.2 only, in support of the imposition of concurrent sentences on Counts One and

5   Two.  The government may oppose any such argument.

6                                **VII.   WAIVERS**

7        **A.   Waiver of Constitutional Rights.**

8        The defendant understands that by pleading guilty he is waiving the following constitutional

9   rights:  (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to

10  be assisted at trial by an attorney, who would be appointed if necessary; (d) to pursue any affirmative

11  defenses, Fourth Amendment or Fifth Amendment claims, constitutional challenges to the statutes of

12  conviction, and other pretrial motions that have been filed or could be filed; (e) to subpoena witnesses to

13  testify on his behalf; (f) to confront and cross-examine witnesses against him; and (g) not to be

14  compelled to incriminate himself.

15       **B.   Waiver of Appeal and Collateral Attack.**

16       The defendant understands that the law gives the defendant a right to appeal his guilty plea,

17  conviction, and sentence.  The defendant agrees as part of his plea, however, to give up the right to

18  appeal the guilty plea, conviction, and the sentence imposed in this case as long as the sentence does not

19  exceed the statutory maximum for the offenses to which he is pleading guilty, including if the Court

20  imposes consecutive terms on Counts One and Two.  The defendant understands that this waiver

21  includes, but is not limited to, any and all constitutional and/or legal challenges to the defendant's

22  conviction and guilty plea, including arguments that the statutes to which the defendant is pleading

23  guilty are unconstitutional, and any and all claims that the statement of facts attached to this Agreement

24  is insufficient to support the defendant's plea of guilty.  The defendant specifically gives up the right to

25  appeal any order of restitution the Court may impose.

26       Notwithstanding the defendant's waiver of appeal, the defendant will retain the right to appeal if

27  one of the following circumstances occurs: (1) the sentence imposed by the District Court exceeds the

28  statutory maximum for both Counts; and/or (2) the government appeals the sentence in the case.  The

PLEA AGREEMENT                           13

1   defendant understands that these circumstances occur infrequently and that in almost all cases this

2   Agreement constitutes a complete waiver of all appellate rights.

3       In addition, regardless of the sentence the defendant receives, the defendant also gives up any

4   right to bring a collateral attack, including a motion under 28 U.S.C. § 2255 or § 2241, challenging any

5   aspect of the guilty plea, conviction, or sentence, except for non-waivable claims.

6       Notwithstanding the government's agreements in paragraph III.A above, if the defendant ever

7   attempts to vacate his plea, dismiss the underlying charges, or modify or set aside his sentence on any of

8   the counts to which he is pleading guilty, the government shall have the rights set forth in Section II.E

9   herein.

10      **C.      Waiver of Attorneys' Fees and Costs.**

11      The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-

12  119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the

13  investigation and prosecution of all charges in the above-captioned matter and of any related allegations

14  (including without limitation any charges to be dismissed pursuant to this Plea Agreement and any

15  charges previously dismissed).

16      **D.      Impact of Plea on Defendant's Immigration Status.**

17      The defendant recognizes that pleading guilty may have consequences with respect to his

18  immigration status if he is not a citizen of the United States. Under federal law, a broad range of crimes

19  are removable offenses, including offense(s) to which the defendant is pleading guilty. The defendant

20  and his counsel have discussed the fact that the charges to which the defendant is pleading guilty is an

21  aggravated felony, or a crime that is likely to be determined to be an aggravated felony under 8 U.S.C. §

22  1101(a)(43), and that while there may be arguments that the defendant can raise in immigration

23  proceedings to avoid or delay removal, it is virtually certain that the defendant will be removed.

24  Removal and other immigration consequences are the subject of a separate proceeding, however, and the

25  defendant understands that no one, including his attorney or the district court, can predict to a certainty

26  the effect of his conviction on his immigration status. The defendant nevertheless affirms that he wants

27  to plead guilty regardless of any immigration consequences that his plea may entail, even if the

28  consequence is his automatic removal from the United States.

PLEA AGREEMENT                          14

## VIII.   **ENTIRE PLEA AGREEMENT**

Other than this Plea Agreement, no agreement, understanding, promise, or condition between the government and the defendant exists, nor will such agreement, understanding, promise, or condition exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and counsel for the United States.

## IX.   **APPROVALS AND SIGNATURES**

### A.   **Defense Counsel.**

I have read this Plea Agreement and have discussed it fully with my client. The Plea Agreement accurately and completely sets forth the entirety of the agreement. I concur in my client's decision to plead guilty as set forth in this Plea Agreement.

Dated:  **10/22/2019**

_____
CHRISTIAN E. PICONE
Attorney for Defendant

### B.   **Defendant:**

I have read this Plea Agreement and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my case. No other promises or inducements have been made to me, other than those contained in this Plea Agreement. In addition, no one has threatened or forced me in any way to enter into this Plea Agreement. Finally, I am satisfied with the representation of my attorney in this case.

Dated:  **10/22/2019**

_____
RONALD J. ROACH
Defendant

### C.   **Attorney for United States:**

I accept and agree to this Plea Agreement on behalf of the government.

Dated:  **10/22/2019**

McGREGOR W. SCOTT
United States Attorney

_____
ANDRÉ M. ESPINOSA
Assistant United States Attorney

PLEA AGREEMENT                                15

EXHIBIT "A"
Factual Basis for Plea

## I.     **Background**

**A.     The conspirators operate a $2.5 billion Ponzi scheme causing $1 billion in loss.**

From December 2009 through January 2019, Individual 1 and Individual 2, husband and wife, owned and operated two closely related business entities, Company S and Company D (collectively "the Company"). During nearly all of that period, the Company operated a Ponzi scheme that defrauded investors of approximately $1 billion through material misrepresentations and omissions related to the offer and sale of investments designed to generate profit and trigger significant tax benefits for investors. Between approximately 2016, and February 2019, the headquarters for the Company was located in Benicia, California, in the Eastern District of California. Defendant, Ronald J. Roach, was a certified public accountant and began working with the Company in late 2011.

**B.     The Company sells MSGs to generate profit and to trigger tax benefits.**

Directly and through subcontractors, the Company built mobile solar generators ("MSGs"), consisting primarily of solar panels placed on a wheeled-trailer. Company D purported to lease those MSGs to third parties, including negotiating lease agreements and collecting payments. Individual 1 and others acting at his direction touted the versatility of MSGs, and claimed there was a substantial market demand for MSGs.

The Company, through Individual 1, his co-conspirators, and others acting at their direction, solicited money from investors to purchase MSGs. A primary claim made to investors was that the purchase of MSGs carried favorable tax consequences in addition to a profit stream. The tax benefits included tax credits available for investment in alternative energy sources that permitted purchasers to claim tax credits of up to 30% of the total investment, and permitted deductions for the depreciation of MSGs over a 5-year period. These tax benefits were significant.

The Company structured transactions with investors to maximize the tax benefits. Among other deals, the Company sold MSGs to limited liability companies created specifically for such transactions. These companies were investment funds, sometimes called tax-equity funds, permitted under the federal tax code ("Funds").

PLEA AGREEMENT                                      A-1

1   **C.      Transaction financing structure and the materiality of promised lease revenue.**

2        Through the Funds, investors purchased MSGs from Company S for $150,000 per MSG.

3   Typically, investors paid approximately $45,000 per MSG in cash—approximately 30% of the overall

4   unit price—and financed the balance with Company S.  The $45,000-per-unit price was the maximum

5   amount of the tax credit investors could claim per unit.  The transactions were structured so investors

6   could immediately claim a dollar-for-dollar tax credit for the total they paid in cash to Company S, per

7   MSG.  Investors could also claim depreciation for each MSG, for five years.  To complete the

8   transactions, the Funds delivered promissory notes to pay Company S the remaining approximately 70%

9   of the sales prices over time.  The Company promised to pay off the investors' note obligations with

10  revenues generated by the lease of MSGs by Company D to third parties.

11       Pursuant to offers pitched to investors by Individual 1, his co-conspirators, and others acting at

12  their direction, the Funds leased the MSGs purchased in each transaction to Company D, which

13  purported to lease the MSGs to third parties.  Company D was supposed to receive money from those

14  third parties through lease payments.  After deducting certain fees, Company D was to transfer the

15  majority of the lease revenue to accounts for the Funds.  The manager of the investments funds was to

16  use the lease revenue sent by Company D to pay the periodic obligations on the notes held by Company

17  S, with a small monthly profit paid to investors.[1]

18       The purported lease revenue from third parties was a material component of the transactions.

19  First, that projected lease revenue was a factor in valuing the MSGs at $150,000 per unit.  Second, the

20  lease revenue was the mechanism for the Funds to pay the remaining approximately 70% of the

21  purchase price for the MSGs.  Based on sales pitches by Individual 1, his co-conspirators, and others

22  acting at his direction, investors were primarily interested in the tax benefits offered through each

23  transaction and not actual ownership of the MSGs.  However, because the tax credits were capped at

24  30% of the value of the overall transaction, paying anything more than 30% of that value would

25

---

26   [1] The Company also closed a variant of these tax-equity transactions that did not include financing through
Company S.  Rather, in those sale-leaseback transactions, investors purchased MSGs outright, or relied on outside
27   financing.  In other material respects, the transactions mirrored the primary tax-equity transactions, including the
management of third-party lease contracts by Company D, availability of post-transaction tax benefits, and a
28   profit stream.  Instead of using third-party lease revenue to pay a note obligation to Company S, the purported
revenue was paid to the investor.

PLEA AGREEMENT                              A-2

1 diminish the tax benefits—*i.e.*, the investors would pay more than the value of the tax credits. By
2 paying off the 70% balance of the purchase price through revenue generated by leases Company D
3 promised to generate from third parties, investors maximized the tax benefits without incurring more
4 debt or cost. Failure of that mechanism after investors executed transactions would result in default on
5 the notes, collapse of the transactions, and failure of the tax credits.

6      **D.**    **Purportedly independent certification of the construction and operation of MSGs.**

7      Because the Company promised to lease MSGs associated with each transaction to third
8 parties—through Company D—with little direct participation from the Funds or investors, the Funds and
9 investors did not take physical possession of those MSGs. Rather, the Company represented to the
10 Funds and investors that it built MSGs for each transaction and those MSGs operated in a manner
11 consistent with regulations governing application of the tax credits the investors sought. The Company
12 made those representations through written Commissioning Reports, purportedly prepared by an
13 independent engineer after a multi-point inspection of each MSG in each transaction. Individual 1, his
14 co-conspirators, and others acting at their direction caused those Commissioning Reports to include
15 materially false information and to be delivered to investors. In some instances, investors required
16 completed Commissioning Reports as conditions for payment to support the transactions. In other
17 instances, Individual 1 and his co-conspirators delivered the Commissioning Reports after payment to
18 lull investors to believe their MSGs existed and operated as required under the terms of the transactions.

19      **E.**    **Approximate investments and tax benefit totals associated with the transactions.**

20      Between March 2011 and December 18, 2019, at least twelve investors entered into transactions
21 with the Company through approximately thirty-four Funds. Some investors invested through more than
22 one Fund. The investors, through the Funds, collectively deposited by interstate wire transfer
23 approximately $759,000,000 into bank accounts for the Funds established for the transactions. Further,
24 several financial institutions and other investors transferred collectively $136,000,000 to the Company
25 as part of related transactions for the purchase and lease of MSGs. In total, the Company closed
26 transactions with Funds and others involving approximately 17,000 MSGs, at approximately $2.5 billion
27 in purported value.

28

PLEA AGREEMENT       A-3

1         Many investors have claimed tax credits and depreciation in connection with the transactions

2  premised on the revenue allegedly being generated by Company D's leases of the MSGs to third parties.

3  The tax value of the tax credits and depreciation claimed by the Funds, up to and including the 2017 tax

4  year, is approximately $902,000,000. This figure does not account for approximately $167,000,000 that

5  investors paid into tax equity transactions in 2018.

6      **F.    Operation of the "flip" deals that followed the tax equity transactions.**

7         The Company structured nearly all of the tax-equity transaction so the investors owned 99% of

8  the associated Fund and the fund manager owned 1% the Fund. After five years, the ownership

9  structure flipped, with the fund manager owning 95% of the Fund and the investors owning 5%. After

10  five years, investors had the option of selling their 5% ownership interest in the Fund to the fund

11  manager, and divesting their ownership interest in the MSGs. This appealed to many investors because,

12  after five years, they could extract no further tax benefit from ownership of the MSGs.

13       At the end of a five-year term of a tax-equity transaction, the Company would arrange to sell

14  certain existing MSGs from those transactions to buyers in "flip" deals. In one such transaction,

15  Individual 1, his co-conspirators, and others acting at their direction brokered a "flip" deal with A-Group

16  and K Bank. As part of that transaction, K Bank provided $27 million to A Group, a private equity

17  group, to finance the purchase of approximately 416 MSGs that were owned by two Funds through

18  earlier tax-equity transactions. The $27 million from K Bank represented approximately 80% of the

19  overall transaction. A Group investors contributed the balance of the purchase price. The deal was

20  completed through a special purpose entity called S-Sense.

21       Individual 1, his conspirators, and others acting at their direction represented to A Group and K

22  Bank that the 416 MSGs were leased to Telecom Company A as part of an approximately 10-year fixed

23  amount contract between Telecom Company A and Company D. After the sale, S-Sense leased the

24  MSGs back to Company D to continue leasing them to Telecom Company A as part of the purported

25  existing contract between them. Thereafter, the Company assigned purported lease revenue generated

26  by that lease with Telecom Company A to S-Sense as a revenue and profit stream.

27      **G.    The Company's tax equity transactions were fraudulent.**

28      Bank records, witness interviews, and other evidence, revealed that Individual 1 and his co-

PLEA AGREEMENT        A-4

1   conspirators knowingly misrepresented the existence of lease revenue from third parties—an integral

2   component in all of the Company's transactions—and caused others to unwittingly do so.  In particular,

3   the conspirators claimed Company D generated tens of millions of dollars in lease revenue from third

4   parties leases, from long-term and short-term agreements with third parties.

5        In truth, Individual 1 and his co-conspirators operated the Company as a massive Ponzi scheme.

6   Over 90% of the money Company D claimed as lease revenue, and which it used to pay the Funds' note

7   obligations and other payments to investors was actually derived from transfers of cash contributed to

8   Company S by later investors in tax-equity and other transactions.  Company S had nearly no other

9   significant sources of revenue.  Company S was the primary source of income for Company D,

10   providing no less than approximately 94% of all of the purported revenue Company D claimed.  Thus,

11   the Company merely paid obligations due to older investors with money raised from those investors and

12   later investors—contrary to representations to investors made by Individual 1, his co-conspirators, and

13   those acting at their direction, that third-party lease revenue would pay those obligations.  Certain of

14   Company D's existing third-party lease agreements were supported with separate side-agreements

15   pursuant to which Company S paid investor money to third parties, which the third parties returned in

16   the form of lease revenue.  The conspirators concealed the absence of third-party lease revenue from

17   investors through, among other means, false financial statements they knowingly shared with investors.

18      **H.**     **The A Group/K Bank "flip" deal transaction was fraudulent.**

19        The A Group/K Bank "flip" was also a fraud.  Contrary to representation made by Individual 1,

20   his co-conspirators, and others acting at their direction, the purported fixed-term lease between Telecom

21   Company A and Company D that supported the transaction was false.  Rather, certain as-needed leases

22   with Telecom Company A generated only a fraction of the millions in annual revenue Individual 1 and

23   his co-conspirators claimed supported the A Group/K Bank deal.  The overwhelming majority of that

24   purported revenue derived from intercompany transfers of tax-equity investor money from Company S

25   to Company D.  In support of the transaction, and in furtherance of the fraud, Individual 5 knowingly

26   caused a fraudulent estoppel agreement to be delivered to A Group/K Bank in support of the transaction,

27   which purported to assign lease revenue to A Group/K Bank, when that lease agreement and the

28   purported revenue associated with it did not exist.

I.     **The December 2018 searches and asset seizures, the Company's bankruptcy, and the MSG audit by investor-victims.**

In December 2018, law enforcement agents executed search warrants at the Company's headquarters and elsewhere. Agents also executed over 150 asset seizure warrants, resulting the seizure of approximately $60,000,000 in assets derived from the fraud. During execution of those warrants, agents found approximately $1.7 million in cash in Individual 1's office safe and over $150,000 in cash in other locations throughout the office suite. Inside the chief financial executive's office, agents found investor presentations and marketing documents, as well as internal financials for Company D's performance in November 2018 and December 2018. Agents also interviewed employees, at least one of whom provided information about the Company's structure and evidence of the ongoing fraud.

Following execution of those warrants, the Company entered bankruptcy in or about February 2019. Thereafter, certain investor-victims financed an independent audit of the existence and location of all MSGs based on information that the Company had not built the total number of MSGs it represented to investors were part of the tax-equity transactions. The audit produced evidence of the existence of approximately only 6,000 MSGs from approximately 17,000 MSGs associated with sales to Funds in approximately thirty-four tax-equity transactions. Among others, none of the approximately 2,280 MSGs associated with Fund 29, involving over $100,000,000 in cash paid by an investor in or about May 2017, were located in the investor-victim audit. Additionally, only approximately eighty-three of the 2,279 MSGs associated with Fund 33, involving more than $90,000,000 in cash paid by the same investor in or about July 2018, were located in the investor-victim audit.

II.     **Facts Describing Defendant's Involvement in the Scheme**

A.     **Roach and his co-conspirators agree to conceal Company D's failure to generate third-party lease revenue to meet its obligations, and launch the Ponzi scheme.**

Defendant Ronald J. Roach ("Roach") knowingly facilitated the Company's fraud. Roach was a certified public accountant and worked as a tax consultant and financial advisor for the Company. While Roach maintained an accounting practice between 2011 and 2018, most of his professional work in that period was devoted to providing advice and service to Individual 1 and the Company.

As early as mid-2012, Roach agreed with Individual 1 and other co-conspirators to conceal

1    Company D's failure to generate third-party lease revenue to pay to the Funds to cover their note

2    obligations.  Payment of those obligations with third-party lease revenue was a material term of the

3    offers supporting the tax equity transactions and the agreements governing their operation.  Roach, his

4    co-conspirators, and others acting at their direction supported that material promise to investors with

5    claims of extraordinary market demand for MSGs.  However, during nearly all of the Company's

6    operation, the conspirators knowingly misrepresented market demand for MSGs and Company D's

7    ability to generate third-party lease revenue.  Roach and his co-conspirators told those lies to lull

8    existing investors and induce new investors to give them more money.

9        Roach and his conspirators knew in early 2012 that Company D was not generating third-party

10   lease revenue sufficient to satisfy its obligations, and that the problem was ongoing.  In July 2016,

11   Roach sent an email to Individual 1 and Individual 3 that included spreadsheets outlining sublease

12   activity by Company D between 2012 and 2015.  For each year, Company D generated less than 5% of

13   the lease revenue necessary to meet its obligations.  For the combined period, Company D generated

14   $2,157,606.24 in third-party lease revenue to cover approximately $57,094,008.07 in obligations, a rate

15   of 3.78%.  Company D was not struggling.  It was a failure.  Yet, between August 2016 and December

16   2018, the conspirators closed transactions involving approximately $584,000,000 in investments, all

17   premised on false claims about the purportedly robust market for MSGs, false claims about Company

18   D's revenue, and false claims about the existence of certain third-party leases.  Despite Company D's

19   overall utilization rate below 4%, Individual 1 falsely claimed to various investors, on different

20   occasions, that the rate was between 90% and 100%.[2]

21           (i)     **Roach and his co-conspirators book cash transfers from Company S to
                     Company D as "revenue" on Company D's financial statements to hide**
22                   **Company D's failure to generate third-party lease revenue.**

23       Within the first six months of Roach's work with the Company, Roach learned that Company D

24   was not generating sufficient third-party lease revenue to meet its obligations to the Funds.  At that time,

25   in approximately June 2012, Roach participated in a discussion with Company executives and others

26

27   [2] Company D's obligations to the Funds arose from a Master Lease Agreement ("MLA") it executed with the
     Funds to lease all MSGs in most transactions and to make payments to the Funds for those rentals.  The Company
28   represented to investors that revenue to pay MLA obligations would come from sub-leases secured by Company
     D.  The utilization rate was the percentage of sub-lease revenue available to pay Company D's MLA obligations.

PLEA AGREEMENT                               A-7

1    about how the Company should proceed.  That discussion included Roach, Individual 1, Individual 3,

2    and others.  The conspirators decided not to disclose to investors Company D's failure to generate third-

3    party lease revenue.  Instead, Roach, Individual 1, Individual 3, and the other participants elected to

4    conceal Company D's failure from current and future investors by, among other means, making periodic

5    transfers of investor money paid to Company S into Company D's account, and misrepresenting it as

6    third-party lease revenue.  The concealed intercompany transfers began as early as December 2012.

7        Roach helped develop the accounting used to book transfers between Company S and Company

8    D.  That accounting included booking the transfers as "costs of goods sold" in Company S's financial

9    statements, a method that was at least misleading.  Those transfers were fraudulently booked as revenue

10   in Company D's financials.  Roach and his co-conspirators wanted readers of the Company D's financial

11   statements to be misled.  Specifically, Roach and his co-conspirators intended readers of Company D's

12   financial statements to believe the purported revenue was generated by third-party lease agreements and

13   not from transfers from Company S.  If asked for detail supporting Company D's purported revenue,

14   Individual 3 often took the lead in warding off the request, usually claiming the detail was confidential.

15       Initially, Roach viewed the Company as a "start-up," navigating short-term business problems

16   with a short-term solution.  Roach, Individual 1, and Individual 3 had multiple conversations about the

17   problems with the Company's business model, particularly Company D.  As time passed, Company D's

18   situation did not change.  In September 2013, Roach prepared false financial statements for Company D,

19   for 2011 and 2012, which mischaracterized transfers from Company S as revenue Company D earned,

20   knowing existing and prospective investors would rely on the statements.  By February 2014, Roach

21   knew an audit of Company D would reveal the ongoing fraud.  At that time, Roach advised Individual 1

22   that due diligence related to a proposed capital infusion would expose Company D's failure to generate

23   revenue.  For the same reason, in part, Roach declined overtures from Individual 1 to serve as the

24   Company's Chief Financial Officer ("CFO").  Concerns over Individual 1 and Individual 2 taking

25   Company money for personal use also contributed to Roach's decision to decline the CFO position.

26   Roach stopped believing the Company would be successful.  Nevertheless, he engaged in additional

27   overt acts in furtherance of the conspiracy, including by compiling false financial statements for

28   Company D for 2013 through 2017, and for the period ending July 2018, knowing existing and

1   prospective investors would rely on those statements, and intending that outcome.

2           **(ii)    Roach and his co-conspirators rely on a phony "Re-rent Agreement" to
                       justify the intercompany transfers to auditors of Company S.**
3

4           To justify the intercompany transfers, Roach and his co-conspirators relied, in part, on a phony

5   "Re-rent Agreement" executed between Company S and Company D. That agreement purports to

6   authorize Company S to lease MSGs from Company D and "re-rent [them] to its own customers."

7   Under the phony agreement, Company D would deliver monthly invoices to Company S, which

8   Company S would pay with third-party rental revenue. Company D would then use that "revenue" to

9   meet its obligations to pay the Funds.[3] Roach knew of no evidence that Company S generated any third-

10  party lease revenue to pay to Company D for renting MSGs under the Re-rent Agreement. Although the

11  Re-rent Agreement was purportedly executed in 2011, Roach first saw it in 2014, after Individual 3

12  delivered it to him. Roach believes Individual 3 drafted the Re-rent Agreement in 2014, and backdated

13  it to 2011. The Re-rent Agreement bears signatures in the names of Individual 1 and Individual 2. At

14  least as early as 2015, Roach referenced the Re-rent Agreement to Company S's outside auditor to

15  explain the intercompany transfers. In 2018, that auditor suggested disclosure of the transfers, at least in

16  a footnote, in Company S's financial statement. No disclosure was made that year.

17          **B.      Roach provides false information supporting the offer and sale of the A Group/K
                      Bank flip deal.**
18

19          Roach participated in conference calls and meetings with certain investors while working for the

20  Company. Thus, even though Roach was an outside advisor to the Company, he was also a *de facto*

21  Company employee in relation to those investors. In that capacity, Roach participated in both the offer

22  and sale of certain tax-equity, sale-leaseback, and flip transactions the Company closed. Among others,

23  Roach participated in the offer and sale of the A Group/K Bank flip deal. In support of that deal, on July

24  18, 2017, Roach delivered by email false documents to an A Group executive. Roach sent the email

25  from California to the A Group executive in Pennsylvania. Attached to the email were financials for

26  Company D for 2014 through 2016, which Roach knew falsely represented transfers of investor money

27  _____
        [3] The Re-rent Agreement is silent about how Company S—the sales and manufacturing side of the
28  Company—would accomplish what Company D failed to do, despite the fact that Company D existed almost
    exclusively for the purpose of generating third-party lease revenue.

PLEA AGREEMENT                          A-9

1  from Company S to Company D as revenue.  Also attached to the email was an aging report that

2  purported to set forth payment history for MSG rentals by Telecom Company A pursuant to a purported

3  fixed-term lease agreement between Telecom Company A and Company D.

4      Roach sent the aging report at the direction of Individual 1, and both knew the information it

5  contained was false.  Both also knew the lease underlying the aging report—between Telecom Company

6  A and Company D—was also false.  Both were aware of the true third-party revenue generated by

7  Company D at the time.

8      Individual 1 told Roach he needed Roach's help to close the A Group/K Bank deal.  The deal did

9  not involve a financing with Company S.  Instead, A Group and K Bank paid approximately $34 million

10 to purchase MSGs outright.  Individual 1 told Roach and Individual 3 that he would pay each $500,000

11 if they helped Individual 1 close the A Group/K Bank deal.  Individual 1 kept his word and paid both.

12 Individual 1 delivered the false contract between Telecom Company A and Company D to other

13 investors as evidence of third party lease revenue supporting proposed transactions.

14     **D.      Roach's conduct and that of his co-conspirators caused interstate wires.**

15     Roach agrees his conduct and that of his co-conspirators caused, including the email discussed

16 above and other interstate wire communications, Fedwire deposits from accounts related to S-Sense, the

17 entity established to facilitate the A Group/K Bank transaction, to accounts controlled by the Company,

18 as set forth below:

19

| Company Bank | Account No. | Date | Deposit Amount | Payor |
|---|---|---|---|---|
| H Bank | ending 2481 | 7/31/2017 | $14,744,692.31 | S-Sense related |
| H Bank | ending 2481 | 7/31/2017 | $3,753,307.69 | S-Sense related |
| H Bank | ending 2499 | 7/31/2017 | $12,638,307.69 | S-Sense related |
| H Bank | ending 2499 | 7/31/2017 | $3,201,692.31 | S-Sense related |

*I have read and carefully reviewed the Factual Basis for Plea with my attorney.  I agree that as it concerns my conduct it is correct.  I also agree that if this matter proceeded to trial, the United States could establish each of the facts contained within the Factual Basis for Plea beyond a reasonable doubt, and that those facts satisfy the elements of the offense to which I am pleading guilty.*

Dated: 10 -17- 19

_____
RONALD J. ROACH
Defendant

PLEA AGREEMENT                                    A-10